## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **CHARMAINE INGLETON** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.**_____ |
| ) | |
| **CITY OF ALEXANDRIA,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiff, Charmaine Ingleton ("Ms. Ingleton" or "Plaintiff"), by her undersigned Counsel, files this Complaint of discrimination, based on Race, National Origin, Sex, Age, Disability, Retaliation and Harassment/Hostile Work Environment, against the City of Alexandria ("City," or "Defendant"), pursuant to Title II, Section 1981, the Age Discrimination in Employment Act of 1967 ("ADEA") as amended, 29 U.S.C. § 633a., Americans with Disabilities Act, ("ADA"), Retaliation and Harassment/Hostile Work Environment.

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over Plaintiff's discrimination claims pursuant to 28 U.S.C. § 1331.


2.      Venue is proper in the United States District Court, District of Virginia, Eastern Division in Alexandria Virginia, pursuant to 28 U.S.C. § 1391. Plaintiff worked in Virginia, and her claims arose, in Virginia, where she was employed by the City of Alexandria as Parking

Enforcement Officer II of the City's Police Department, where the adverse decisions giving rise to this suit were made.

## **PARTIES**

Plaintiff:

3.      Ms. Ingleton, is an immigrant whose national origin is Jamaica. She is a woman, of over the age of 40. She is a citizen of the United States, and a resident of Alexandria Virginia. Plaintiff was employed by the City as a Parking Enforcement Officer II, from 2001 till 2018, when she was discriminatorily and unlawfully terminated.

4.      Ms. Ingleton is an employee of Defendants under Title VII, Section 1981, the ADA, and the ADEA.

5.      Ms. Ingleton is a person with a disability because she has a physical impairment that substantially limits one or more major life activities, (including standing, lifting heavy objects, walking) due to the injury she sustained on the job.

Defendant:

6.      Defendant City of Alexandria, VA, is a city in the Commonwealth of Virginia.

7.      Defendant is an employer within the meaning of Title VII, Section 1981, the ADA, and the ADEA.

**Employment History**

8.      On December 10, 2001 Ms. Ingleton was hired as a Parking Enforcement Officer, with the Alexandria Police Department, with a starting salary of $23,942 per year. On December 6, 2018, she was discriminatorily and wrongfully terminated.

**Issue with Tow Truck Driver**

9.      On July 18, 2018, Plaintiff was at her house sitting in her vehicle in her driveway at 4422 Vermont Avenue, readying to drive out to the store to get some cleaning supplies to clean her carpet, when she saw a tow truck pull up and blocked her driveway. She called out from her vehicle to the driver "you are blocking my driveway." The driver exited his truck and walked into her yard, and stood by the passenger side of her vehicle.

10.     She rolled her car window down slightly and asked the tow truck driver: "can I help you?" He responded and held up a piece of paper and said "you are not going anywhere, I am taking your vehicle." To which Plaintiff said to him: "let me see the paper" but he said "No."

11.     Ms. Ingleton started her car, the tow truck driver then ran back to his tow truck, and pulled the tow truck into Plaintiff's yard facing her vehicle. He kept driving the tow truck closer

to her vehicle which forced her to reverse her vehicle as she was afraid he was going to hit her car.

12.     The tow truck driver then reversed his vehicle. Plaintiff then turned her wheels towards her neighbor's yard at 4424 Vermont Avenue. The tow truck driver then reversed from her driveway and blocked the driveway of her neighbor at 4424 Vermont Avenue. At the time, Plaintiff's cell phone was not working properly. The phone will work for one minute and will not work for another – she tried calling the police but her phone did not work initially.

13.     Ms. Ingleton then drove towards her next neighbor's yard at 4426 Vermont Avenue. The tow truck driver reversed his vehicle and blocked her there at 4426 Vermont Avenue. Plaintiff then saw a man named Bruce Brown appear. Mr. Brown walked up to the door or 4426 Vermont Avenue. Ms. Johnson who lives at 4426, walked up to Plaintiff, and Plaintiff told her that the tow truck driver was trying to take her car.

14.     Mr. Bruce Brown walked up to the tow truck driver spoke to him and then walked towards Ms. Ingleton while she was still sitting in her vehicle, and said to her "you are a thief and I am going to get money today and I am going to take your house." (Mr. Brown is known as a busy body trouble maker in the area, and he wanders about the area).

15.     The tow truck driver then drove his vehicle towards Ms. Ingleton's vehicle, hooked it up, while she was still sitting in it, and lifted it up in the air twice and dropped it, which shook her whole body. She kept trying her phone, until it finally worked and she called the police department and asked them to send a police officer. The police finally showed up about 15-20

minutes later**.** Before the police officers showed up, the tow truck driver had entered Ms.

Ingleton's vehicle and assaulted her by hitting her and cutting her hand, to the extent that it bled.

In self-defense of herself, Ms. Ingleton slapped the tow driver in the face, for assaulting her at

her home in her driveway, and inside her own vehicle.

16.     Two police officers and two parking enforcement officers came to Ms. Ingleton's house.

She called the police, and there was no reason whatsoever, two of her fellow Parking

Enforcement colleagues should be there with the police to "keep the peace". Ms. Ingleton's

colleagues were there solely to gain information about her personal and private matters which

they have no business being part of, in order to use it against her and terminate her – something

they have been trying to do for long, because she was not one of them – she was of a different

national origin.

17.     Having two of her colleagues come to her house without her invitation or consent,

annoyed Ms. Ingleton. She felt her privacy was violated by the two parking enforcement

colleagues who came to her house with the police. She was embarrassed and humiliated, because

they forced themselves into her personal and private affairs.

18.     Ms. Ingleton believes that her colleagues coming to house without her permission, was an

overreach by her department and the police, or whoever asked them to be there, without her

invitation, knowledge or consent. When a citizen calls for the police, which Ms. Ingleton was,

they do not also ask for the police to bring along third parties or their work colleagues, who have

no business being there as the police, to deal with police matters, as opposed to parking enforcement, which was not the issue for which Plaintiff called the police.

19.     Ms. Ingleton told the police officers that she was going into her house to ask her son if he could help her pay the outstanding loan payment, when she looked outside and saw her vehicle on the tow truck and being driven away by the tow truck driver.

20.     Ms. Ingleton had to go to Woodbridge to get her car. When she went to the towing company Dominion Wrecker Service in Woodbridge, she found that her vehicle key was broken and a piece of the key stuck in her ignition. At the time my hand was cut and bleeding, the tow truck driver forced himself into Plaintiff's car, struggled with her to take the car key. When Plaintiff saw the broken key, she realized that was what the tow truck driver used to cut her hand. Plaintiff had to pay $200.00 to remove the broken piece stuck in the ignition, and to have a new key made for her car.

21.     Mr. Bruce Brown (later) told the police department that I hit him with my vehicle, which was not true. Plaintiff never hit Mr. Bruce, the police knew that Plaintiff never hit Mr. Bruce. Mr. Bruce had no wounds or injuries on any part of his person to show where he was hit, he never pressed any assault charges at Plaintiff. Mr. Bruce Brown is a wandering busy body that comes to the neighborhood and causes trouble. Mr. Bruce Brown was never near Plaintiff's vehicle for it to strike him and at no time, did Mr. Bruce ever say in Ms. Ingleton's presence, that she has hit him with her vehicle. Yet, the police and the parking enforcement department connived and used that falsity against Plaintiff as reason for her termination.

22.     Part of the facts Defendant stated as part of its reason for terminating Ms. Ingleton, is that she damaged the lawn of her neighbors. However, all of Plaintiff's neighbors were supportive of her. None of them ever complained about damage to their lawn or anything, in fact, all her neighbors said it was no problem that she drove to their yard, when the tow truck driver wanted to take her vehicle. Yet, the police department and the parking enforcement department, saw her misfortune, as an opportunity to finally get rid of Ms. Ingleton, who they have harassed, discriminated against, and egregiously and continuously maltreated and forced to work in a very hostile environment for years, because of her race, sex, and national origin.

**Discriminatory disparate treatment**

23.     About or sometime in 2018, Police officer Carl Savoy, a 27 year old male, black African American, employee Alexandria VA was charged with two misdemeanors, reckless handling of a firearm and destruction of property at George Washington Middle School, (when his gun discharged). He was not terminated but kept on the job. However, Plaintiff was not charged with anything, but was terminated.

24.     Sometime around 2017 or 2018, Officer Fowler, a white Caucasian male told Plaintiff that he was arrested in Prince William (County), VA for assaulting another Alexandria police officer, and charged but that it was expunged. He was not terminated, and was able to retire, but Plaintiff was terminated, even though he she was never charged of anything.

25.     In 2017, and 2018, Breunda Hatfield, a black African American female, under age 40, was given Reasonable Accommodation ("RA") twice during her pregnancy, and after giving

7

birth. She asked for RA after giving birth and was granted. However, while on that RA, she was secretly doing security work at another job in Maryland while on the Parking Enforcement Department's RA, at the police department. She told Ms. Ingleton that "I worked at my other job last night as a security officer in MD" When Plaintiff reported that fact to the Wendy Webb the then Human Resource manager, she simply said, I did not know she was working elsewhere while on RA. However, nothing happened to Breunda. She was not disciplined or terminated. Ms. Ingleton complained about the fact that Breunda was treated better than her - given RA but she was denied RA even though she sustained her injury on the job. Instead of giving Ms. Ingleton the RA her doctor prescribed, she was terminated.

26.     On or about March 23 2018, Ms. Ingleton requested RA due to her right ankle that was sprained on the job in 2004, that never seemed to heal, and on which she developed severe arthritis, and had a major surgery on it in 2015, Because she is on her feet all the time, this ankle never seem to heal, and as such required constant medical treatment. Ms. Ingleton had already given them to superiors her doctor's note that prescribed that she should not stand for more than 30 minutes without resting, and should not lift anything more than 20lbs.. As a delay tactic and punishment, her supervisor Officer Shrader, without any justification, kept sending her back to the doctor claiming that her doctor's paper work was not right. Plaintiff had to report her supervisor to the HR who intervened before her supervisor would approve her RA at that time.

27.     Because Plaintiff's ankle was still not healed and causing her a lot of pain, and she was still seeing her doctor, gave her another note mandating the same not standing for more than 30 minutes at a time, and not to lift anything over 20lbs. With that note, and as her pain continued on that ankle, Plaintiff made a second RA request on September 19, 2018. Sergeant Mayfield

stated that he sent a memorandum to the chief of police, Chief Brown, for my RA, but it was

never approved and she was terminated instead. Plaintiff and her doctor were scheduling another

surgery, but because she was terminated, Plaintiff lost her medical insurance, and have been

unable to take care of her ankle which is still giving her serious pain.


28.      The police department refused to approve her second request for reasonable

accommodation. Instead they terminated her, using as a lie, a pretext and a cover for their

discrimination, claiming that she damaged her neighbor's lawn and assaulted the tow truck driver

who first assaulted her in her home, and that she hit Mr. Bruce Brown with her vehicle, even

though the police officers and her superiors knew all those to be false.


### Violation of AR 6-20 City of Alexandria Administrative Regulations


29.      On July 8, 2017, I was disciplined for hitting Courtney Taylor with a door.

On July 8, 2017, I requested a meeting with Sergeant Mayfield, to resolve an ongoing issue with

Courtney Taylor. Present at the meeting were, Sergeant Mayfield, Supervisor Shrader, PEO

Courtney Taylor, PEO Simone Henderson, and myself.


30.      During the meeting, Plaintiff felt sick and asked to be excused so that she can leave and

take care of herself, and come back, but she was told not to leave. She left any because she was

not feeling well. She stood up opened the door and exited the room. As she exited, she felt a hit

to her elbow. When she turned around she saw Courtney Taylor with her fist clenched. She said

to Plaintiff: "bitch you hit me and I will fuck you up." Sergeant Mayfield and Supervisor Shrader

held her back as she wanted to hit me more. Plaintiff then said to her "I am sorry if the door hit you it was not intentional, because I did not know you were following me."

31.     Supervisor Shrader supported Courtney hitting me, and commented "had it been me …" However, Sergeant Mayfield told Courtney Taylor to apologize to me, but she refused, and never apologized. She was never punished for disobeying her superior even though she disobeyed Mayfield's order to apologize. As a result of Courtney's assault on Ms. Ingleton, she suffered a concussion on her left elbow.

32.     The Alexandria fire and rescue was called and Plaintiff was transported to the Alexandria Hospital with a blood pressure reading of over 200, and she suffered a concussion to her left elbow. Courtney Taylor is black African American, she is younger than Plaintiff, she was not hurt in anyway even though she claimed the door Plaintiff closed behind her hit her. Courtney Taylor was never disciplined, but Ms. Ingleton was disciplined for hitting Courtney Taylor.

**Vehicle Crash 2016**

33.     On a Saturday, which was Plaintiff's regular day off, when she was not obligated to go to work, the unit was short staffed with only one Parking Enforcement Officer covering the entire city. Plaintiff volunteered to come in and assist. She received a parking complaint and when she arrived at the scene, in order to avoid blocking traffic, she tried backing in a space but the no parking sign was partially in the space and her bumper hit the sign. Her Supervisor then was Officer Shrader and she was written up for bumping the parking sign.

**AWOL 2014 charged awol  On March 12, 2014 Police Directive: Attendance and Leave I received 15 minutes -Day Suspension, 5-Day Loss of Annual Leave  and a Written Reprimand**

34.     On a day in March 2014, when Plaintiff was not feeling well, she took some medication that caused drowsiness which caused her to over sleep. After about five minutes after 7:00 a.m. when she should be at work, her supervisor called her, and she told her that she was not well, and would not be able to come to work. The next day when she went to work, her Supervisor Shrader requested that she go bring in her son so she can interview him and about his mother Plaintiff falling ill and to bring the medication she took to show her. Plaintiff was angry, humiliated, and felt intimidated by her supervisor. She refused to bring in her son, or her medication. Why should I have to bring in my 20 years old son and my medication to you she asked? I just want to see – no, only the doctor who prescribed knows what it was and why I, just wanted to see if he heard the alarm or woke up. They deducted two weeks pay from her. Chief Diane Gittens 15 days initially, but when I met her she dropped it off and gave me 10 days.

35.     Another PEO Tatiana Bentley did over sleep and supervisor Shrader did not discipline her instead she said "I told her grandmother that I would look out for her."  Mona Newman

**AWOL 2013 July 8 She wrote me up saying that I was late for one minute.**

36.     I arrived in the roll call room at 0700 a.m., my scheduled shift time. After roll call, sergeant Magyar said, "Charmaine, you were late" I responded no I was on time, then she said, you were standing which does not count – you have to be sitting down, and she wrote me up for 701, and others were not disciplined and Shrader was my supervisor. At other times Quintin Atkins, Edward Bonds, Cheryl, Puller, Courtney Taylor, were late, standing or come in after roll call but they were never disciplined.

37.     In 2013, She attempted to write me up for leaving the security door open, but it was not me, Latela Elder it was the security guy Rich Espes who said that was not but Latela – Magya never apologized to me for her error in accusing me.

**AWOL January 1, 2011/ On January 06, 2011 Administrative Regulation: Discipline of Employees.  I received 40 hours suspension and a written reprimand**

38.     I had a high fever and had pain on my right lower abdomen, so my son took 2.a.m took me to the emergency, where I was put on IV, I was discharged from Alexandria Hospital around 0615 on that morning. I called the Parking enforcement office, spoke to PEO Mona Newman. She transferred me to sergeant Kochis. I told Kochis my situation and that I would be late. They took her pay for a week.

I arrived at work retrieved my work supplies as usual, and headed out to my department vehicle. I heard someone say "respond to my office to see me." When I looked around, I saw it was

sergeant Kochis. I went into sergeant Kochis' office and he asked me "why were you late?" I

told him that I had just came from the hospital because of the pain in my lower abdomen. He

said, "I am writing you up" I started crying and dropped my autocite on his desk. Kochis then

lied that I threw the autocite at him. Shrader was my supervisor when this happened.

## AWOL February 24, 2011

39.     On February 24, 2011, there was ice on the roadways from a snow storm which
prevented me from getting to work on time. Sergeant Kochis told me that "it was not an excuse"
and wrote me up. Other employees like Edward Bonds (always late), Cheryl Fuller were late and
were not written up. . Shrader supervisor.

## Intentional Animosity, Embarrassment and Humiliation At 2012 Promotion Ceremony

40.     You were promoted to PEO II, in 2011. For the ceremony, which was held at the George
Mason Masonic Temple, January 10, 2012, and you were to bring in a guest, and you brought
your guest. When the names of all promoted Deputy Chief of Police Blane Crole (white
Caucasian) he said it was an oversight even though my name was last on the list, and I am the
only person in the Police Officers, 90 people Parking Enforcement Department who whose name
was not called.  I was embarrassed, and humiliated in front of my guest.

## 2010 Vehicle Property Tax Debt

41.     One employee from Parking Enforcement Department Kevin Calvert, and another at City
Hall treasury, Ms. Virginia, shared information about the fact that Plaintiff was owing some
debts.. David Ray told me this, and when he was retiring, he told me to hire a lawyer and sue the
city. I did not comment, because he too, had also treated me badly also. They sent it into internal
investigation, investigated me, and they gave me a written reprimand.

## Vehicle Crash February 2, 2010 On February 26, 2010 Police Directive: Vehicle use & Maintenance.  I received a Non-Disciplinary Supervisory Counseling.

42.     Sergeant Shield called me at home and asked me to come to work on February 2, 2010 to

assist the Transportation Department in helping to clear the vehicles off the snow covered

emergency route in order to plough the street due to the blizzard.

43.     I told Sergeant Shields ok. I was in the 3700 block of Mount Vernon Avenue driving
north, when I came across a car that was parked, that was blocking traffic. As I tried to avoid a
collision with the traffic coming towards me, my vehicle swiped the illegally parked vehicle.
Officers responded to the driver of the illegally parked car, who said he ran into the store to buy
a phone card.

44.     The City Hall was closed due to the blizzard and the Parking Enforcement Unit was also
closed. I received a Non-Disciplinary Supervisory Counseling.

**March 18, 2009 Intention to prevent me from getting promoted**

45.     My supervisor Ms. Shrader wrote me up for keys I knew nothing about, another black
male employer whom I shared a car with used the car, and instead of hanging the key, he put it in
my box when I was not there. She also wrote me up for a complaint that another Che Roberts
black girl, parking officer took from me and promised to respond to, but did not.  Because of
these, I was denied promotion and instead Courtney Taylor was promoted. Courtney went to
Mona Newman and told that Charmaine is going to be pissed up when she realizes that I got the
PEO II position, because she did not know how she got it.

46.     You were promoted to PEO II, in 2011. For the ceremony, which was held at the George
Mason Masonic Temple, January 10, 2012, and you were to bring in a guest, and you brought
your guest. When the names of all promoted Deputy Chief of Police Blane Crole (white
Caucasian) he said it was an oversight even though my name was last on the list, and I am the
only person in the Police Officers, 90 people Parking Enforcement Department who whose name
was not called.  I was embarrassed, and humiliated in front of my guest.

14

**Vehicle Crash, July 22, 2008 Police Directive : Vehicle Use & Maintenance.  I received a Non-Disciplinary Supervisory Counseling.**

47.     On July 22, 2008, I was at work, driving from the garage at the Hoffman building, a vehicle diving in front of me, made a sudden stop, which resulted in my vehicle hitting the bumper of that vehicle. I received a Non-Disciplinary Supervisory Counseling.

**March 16, 2006 Police Directive: Rules Of Conduct .  I received a written reprimand.**

48.     On March 15 2006, I stayed after work to sign up on the overtime list, which was to be posted that day. I stayed until 8:30 p.m. for that purpose that evening, but the list was never posted that day. I arrived to work the next day (March 16, 2006), at 0700 hours. PEO Edward Bonds came to me in the Parking Enforcement Office with the list and said look Ingleton, the list is posted and it is full. I looked at it and the spaces were filled up with names, but my name was not on it, and I was unable to sign up at that time because it was already full, even though I was there to put my name in, until 8:30 p.m. the previous night, the list was deliberately not compiled until I left. There has been an ongoing issue with the overtime sign up list, because others were putting in their friends name on it, even though their friends were not there to sign in as they should. At that time, my supervisor was Mr. Gallman.

**Vehicular Accident September 3, 2003 wrote up for violation of police directive**

49.     Ms. Ingleton was working your beat on the west end of the city, when my supervisor Mandy Gallman asked me to respond to see her at 2900 Eisenhower Avenue. When I met her, she asked me to go downtown the city to pick up her lunch for her.

50.     I was going back to my beat on the west end while it was raining. I stopped at Pershing to

exit onto Telegraph Road. As I pulled off, I collided with a vehicle that have crept up on my

right side. She was written up for violation of police directive. Plaintiff stopped at stop light at

Pershing waiting for Telegraph to clear but the car behind me pulled

## COUNT I:
### Violation of Title VII on the basis of Race, Sex, And National Origin

51.     The allegations of Paragraphs 1 through 50 are hereby re-alleged and incorporated by
reference as if fully stated herein.

52.     Defendant's actions against Ms. Ingleton is discriminatory on the basis of her race, sex,

and national origin, in violation of Title VII, because she is a black woman whose national origin

is Jamaica, and as such a member of a protected class. She has worked for the City for 17 years,

and have performed her job satisfactorily. Despite that, she was the City took several

unwarranted adverse employment actions against her on the basis of her race, sex and national

origin, which manifested itself in the different way other coworkers in similar situations were

treated differently.

## COUNT II:
### Violation of Section 1981 on the basis of Race

53.     The allegations of Paragraphs 1 through 52 re hereby re-alleged and incorporated by

reference as if fully stated herein.

54.     Defendant's actions against Ms. Ingleton is discriminatory on the basis of her race, sex,

and national origin, in violation of Title VII, because she is a black woman whose national origin

is Jamaica, and as such a member of a protected class. She has worked for the City for 17 years,

and have performed her job satisfactorily. Despite that, she was the City took several

unwarranted adverse employment actions against her on the basis of her race, sex and national

origin, which manifested itself in the different way other coworkers in similar situations were treated differently.

## COUNT III:
### Violation of Title 1 Of The ADA As amended 42 U.S.C. § 12101 et seq. Discrimination Based on Actual Disability

55.     The allegations of Paragraphs 1 through 54 are hereby re-alleged and incorporated by reference as if fully stated herein.

55.     Defendant's conduct as described in this Complaint constitutes discrimination on the basis of actual disability in violation of Title I of ADA, 42 U.S.C. § 12111, et seq.,and its implementing regulation, 29 C.F.R. Part 1630, in the following ways: by pursuing a policy and practice of unwarranted discriminatory treatment of its employees, when it applies disparate treatment to its disabled workers, and for no objective business reasons other than as a way to punish and eventually terminate her because of her disability; by excluding Plaintiff, an otherwise qualified employee from her job on the basis of disability, as defined in the ADA, as amended, because she needed surgery on her right ankle which she injured on the job, and she needed time to deal with that and Defendant did not want to grant her that time, and pretextually terminated her after a personal incident that did not warrant her termination. Defendant engaged in a policy and practice of discrimination.  See, e.g., 42 U.S.C. § 12112(b).

56.     The acts, omissions, policies and practices of Defendant as applied to Ms. Ingleton, constitutes discrimination on the basis of her disability, because it denied Plaintiff, a qualified individual with disability the full enjoyment of her rights to equal employment opportunities

solely on the basis of her disability in violation of Title I of the ADA, 42 U.S.C. §§ 12112 and

12117(a).

**COUNT IV - VIOLATION OF ADA**
**As amended at 42 U.S.C. § 12101 et seq, 42 U.S.C. § 12111(9)(B).**
**Based on Failure to Accommodate Disability**

57.     The allegations of Paragraphs 1 through 56 are hereby re-alleged and incorporated by

reference as if fully stated herein.

58.     Defendants' actions against Ms. Ingleton, when viewed in its totality of the

circumstances, constitutes discrimination against a qualified disabled individual by failure to

accommodate her in employment because of her ankle injury that she sustained at work. By not

offering her any assessment, not engaging her in an "interactive process" to determine a

reasonable accommodation for her so that she can continue being gainfully employed despite her

disability, and by terminating her with impunity, through concerted efforts based on

discriminatory animus, Defendant's failure to accommodate Plaintiff was intentional, a

deliberate and calculated decision to violate the law – Plaintiff got no response to her RA

request, that she made four months earlier – approval usually takes days. Instead of granting her

RA, Defendant used her personal matter which had nothing to do with her job, as a pretext and

cover, for denying her RA, and for terminating her. Because the City discriminated against Ms.

Ingleton in violation of the ADA, City is liable to Ms. Ingleton in damages.

**COUNT IV:**
**Retaliation Under Title VII, Section 1981,**
**The ADA, and The ADEA**

59.     The allegations of Paragraphs 1 through 58 are hereby re-alleged and incorporated by

reference as if fully stated herein.

18

60.     Defendants' actions against Ms. Ingleton, amounts to retaliation when she was denied reasonable accommodation and wrongly terminated based on orchestrated lies and cover up regarding a personal matter, after she had complained to City Hall, the Chief of Police, and her Human Resources Manager about how she has been discriminatorily treated, the hostility against her.

61.     Ms. Ingleton engaged in protected activity when she complained of discrimination to City, her Chief of Police, and her Human Resource manager that she was being denied reasonable accommodation, while others were given, when her supervisor told her that there was no light duty and her Chief of Police told her "that was not true because we always have light duty." It was material adverse action when Ms. Ingleton was later terminated. And it was because she made those complaints that she was terminated.

63.     Because the City through its agents retaliated against Ms. Ingleton in violation of the Title VII, Section 1981, the ADA, and the ADEA, City is liable to Ms. Ingleton in damages.

### COUNT V:
### Harassment/Hostile Work Environment
### Under Title VII, Section 1981, The ADA, and The ADEA

64.     The allegations of Paragraphs 1 through 63 are hereby re-alleged and incorporated by reference as if fully stated herein.

65.     Defendant and its agents created a hostile environment for Ms. Ingleton because she was constantly and continuously singled out for punishment, in situations that no fair minded objective employer or superiors will punish an employee for. They harassed her, targeted her, discriminatorily and egregiously docked her pay for no justifiable reason. She was picked upon

by her supervisors and colleagues, she was monitored and micromanaged, she was constantly
and continuously embarrassed, abused, ridiculed, insulted, and intimidated to a zombie-like
submission, because she needed her job and her pay check, and her tormentors knew it.
For example, it was egregious and clear hostility towards Plaintiff when out of invidious
discriminatory animus, her superiors duct a whole weeks pay from her for no justifiable reason.

66.     Because the City through its agents retaliated against Ms. Ingleton in violation of the
Title VII, Section 1981, the ADA, and the ADEA, City is liable to Ms. Ingleton in damages.

WHEREFORE, Plaintiff prays the Court for relief as follows:

(a)     Grant judgment in favor of Plaintiff and declare that City violated Title VII.

(b)     Grant judgment in favor of Plaintiff and declare that City violated § 1981.

(c)     Grant judgment in favor of Plaintiff and declare that City violated the ADA.

(b)     Grant judgment in favor of Plaintiff and declare that City violated the ADEA.

(c)     Grant judgment in favor of Plaintiff and declare that City through its agents, harassed and
created a hostile work environment for her to work in.

(d)     Grant judgment in favor of Plaintiff and declare that City through its agents, retaliated
against her.

(e)     Award Plaintiff Compensatory damages, including damages for pain and suffering, in the
tune of $1,000,000 (One million dollars) due to Defendant's violation of the relevant laws;

(f)     Award Plaintiff Punitive Damages of $2,000,000 (Two million dollars) to punish
Defendants for their intentional discrimination, and reckless disregard for her civil rights.

(g)     Back pay with interest;

(h)     Front pay;
 (i)    Reasonable Attorneys' Fee and Costs;

 (j)      Injunctive Relief – barring Defendant and its employees, agents, from engaging in discriminatory employment policies and practices against employees based on disability;

(k)      Such other appropriate relief as the Court deems fit, and as the interests of justice demands.

<u>**DEMAND FOR JURY TRIAL**</u>

TRIAL BY JURY IS DEMANDED ON ALL ISSUES TRIABLE BY JURY.

 Respectfully submitted this 25th day of September, 2019.

/s/_____
Stephen Christopher Swift
Swift & Swift, Attorneys at Law, P.L.L.C.
Suite 200
2121 Eisenhower Avenue
Alexandria, Virginia 22314-4688
Telephone: (703) 418 – 0000
Facsimile: (703) 535 – 8205
E-mail: steve@swift.law.pro

*Attorney for Plaintiff Charmaine Ingleton*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2019, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of electronic filing

(NEF) to Defendant's counsel as follows:


Joanna C. Anderson
City Attorney of Alexandria
City of Alexandria, VA.
Alexandria City Hall, Room 1300
301 King Street
Alexandria, VA 22314
Tel: 703.746.3750
Email: joanna.anderson@alexandriava.gov

*Attorney for Defendant*




/s/   _____
Stephen Christopher Swift
Swift & Swift, Attorneys at Law, P.L.L.C.
Suite 200
2121 Eisenhower Avenue
Alexandria, Virginia 22314-4688
Telephone: (703) 418 – 0000
Facsimile: (703) 535 – 8205 E-mail: steve@swift.law.pro

*Attorney for Plaintiff Charmaine Ingleton*